### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF FLORIDA
### MIAMI DIVISION

| | |
|---|---|
| JUDITH CEFALY, CATHRYNE FERA, and ALBERT BRUMITT, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>COMMUNITY LOAN SERVICING, LLC,<br><br>Defendant. | Case No. _____<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiffs Judith Cefaly, Cathryne Fera, and Albert Brumitt ("Plaintiffs"), individually and on behalf of all others similarly situated, bring this Class Action Complaint against Community Loan Servicing, LLC ("CLS" or "Defendant") and allege, upon personal knowledge as to their own actions and their counsel's investigations, and upon information and belief as to all other matters, as follows:

## I.  INTRODUCTION

1.     This action stems from Defendant's failure to secure the sensitive personal information of its current and former customers and other consumers for whom Defendant performed services. Defendant CLS is a mortgage loan servicing corporation.

2.     CLS obtains certain personally identifying information related to its customers—current and former mortgagees, as well as mortgage applicants—in furtherance of services it performs on their behalf.[1]

---

[1] Community Loan Servicing, LLC, *Privacy Notice* (Sept. 2020), https://www.communityloanservicing.com/wp-content/uploads/NL009-CLS-Privacy-Notice-2020.pdf,  (last visited Oct. 25, 2022).

3.      Plaintiffs bring this class action against Defendant for its failure to properly secure and safeguard sensitive personally identifiable information provided by and belonging to its customers, including, without limitation, name, and Social Security number and, for some, information provided in connection with a loan application, loan modification, or other items regarding loan servicing (collectively, "PII").

4.      On or around October 27, 2021, an intruder gained entry to Defendant's network systems, accessed the PII stored therein, and exfiltrated information (the "Data Breach"). In early December 2021, Defendant identified this "security incident involving unauthorized access to [its] file servers."[2] Defendant determined that "an unauthorized person obtained access to files on [its] file storage servers from October 27, 2021 to December 7, 2021."[3]

5.      On January 31, 2022, the review process determined that the unauthorized actor accessed and exfiltrated the PII of over one hundred thousand people,[4] current and former CLS clients, which included Plaintiffs. The current and former customers of CLS are referenced below as "Class Members."

6.      On or around August 16, 2022, Defendant began notifying various Attorneys General, Plaintiffs and Class Members.

7.      Defendant acquired, collected and stored Plaintiffs' and Class Members' PII and/or financial information in connection with Defendant's provision of mortgage loan servicing.

---

[2] State of California Department of Justice, Rob Bonita, Attorney General, *Community Loan Servicing, LLC Notice of Data Breach* (Oct. 17, 2022), https://oag.ca.gov/ecrime/databreach/reports/sb24-556436  (last visited Sept. 28, 2022).

[3] *Id.*

[4] https://www.in.gov/attorneygeneral/consumer-protection-division/id-theft-prevention/files/DB_-09.09.22.pdf  (last visited Oct. 17, 2022).

8.      By obtaining, collecting, using, and deriving a benefit from Plaintiffs' and Class Members' PII, Defendant assumed legal and equitable duties to these individuals to safeguard and protect the PII from unauthorized access. Defendant admits that the unencrypted PII accessed and exfiltrated includes highly sensitive information, such as names and Social Security numbers.[5] The sensitive information also included, for some, information that CLS required from customers in connection with loan applications, loan modifications, or other loan-related services. This information more than likely includes, but is not limited to, dates of birth, addresses, phone numbers, financial or bank account information, driver's license numbers, and email addresses.

9.      The exposed PII of Plaintiffs and Class Members can be sold to other identity thieves or on the dark web, a hidden network of black-market websites that serves as a "haven for all kinds of illicit activity (including the trafficking of stolen personal information captured through means such as data breaches or hacks)."[6]

10.     Plaintiffs and Class Members face an ongoing and lifetime risk of identity theft, which is heightened by the exposure of their Social Security numbers.

11.     This PII was compromised due to Defendant's negligent and/or careless acts and omissions and its failure to protect PII of Plaintiffs and Class Members.

12.     Until notified of the breach, Plaintiffs and Class Members had no idea that their PII

---

[5] It is clear that the personal information exposed in the Data Breach was not encrypted: For example, California law requires entities to notify California residents "whose **unencrypted personal information** was, or is reasonably believed to have been, acquired by an unauthorized person" due to a "breach of the security of the system[.]" Cal. Civ. Code § 1798.82(a)(1) (emphasis added). Defendant notified residents and the California Attorney General of the Data Breach beginning on or about August 19, 2022, evidencing that the exposed data was unencrypted (*see* https://oag.ca.gov/system/files/CLS_CA%20Sample.pdf (last visited Oct. 26, 2022.))

[6] https://www.experian.com/blogs/ask-experian/what-is-the-dark-web/ (last visited Oct. 26, 2022).

had been compromised by the Data Breach and that they were, and continue to be, at significant

risk of identity theft and various other forms of personal, social, and financial harm. This risk will

remain for their rest of their lives.

13.     Plaintiffs bring this action on behalf of all persons whose PII was compromised as

a result of Defendant's failure to: (i) adequately protect the PII of Plaintiffs and Class Members;

(ii) warn Plaintiffs and Class Members of its inadequate information security practices; and (iii)

effectively secure hardware containing protected PII using reasonable and effective security

procedures free of vulnerabilities. Defendant's conduct amounts to at least negligence and violates

federal and state statutes designed to prevent or mitigate this very harm.

14.     Plaintiffs and Class Members have suffered actual and present injuries as a direct

result of the Data Breach, including: (a) theft of their PII; (b) costs associated with the detection

and prevention of identity theft for their respective lifetimes; (c) costs associated with time spent

and the loss of productivity from taking time to address and attempt to ameliorate, mitigate, and

deal with the consequences of the Data Breach; (d) invasion of privacy; (e) the emotional distress,

stress, nuisance, and annoyance of responding to, and resulting from, the Data Breach; (f) the

present and/or imminent injury arising from actual and/or potential fraud and identity theft posed

by their personal data being placed in the hands of the ill-intentioned hackers and/or criminals; (g)

damages to and diminution in value of their personal data entrusted to Defendant on the mutual

understanding that Defendant would safeguard their PII against theft and not allow access to and

misuse of their personal data by others; and (h) the continued risk to their PII, which remains in

the possession of Defendant, and which is subject to further injurious breaches, so long as

Defendant  fails to undertake appropriate and adequate measures to protect Plaintiffs' and Class

Members' PII.  Plaintiffs and Class Members, at the very least, are entitled to damages and

injunctive relief tailored to address the vulnerabilities exploited in the breach, and designed to protect Plaintiffs' and Class Members' PII, as well as an order from the Court directing the destruction and deletion of all PII for which Defendant cannot demonstrate a reasonable and legitimate purpose for continuing to maintain possession of such PII.

15.     Defendant understands the need to protect the privacy of its customers and use security measures to protect its customers' information from unauthorized disclosure.[7] And as a sophisticated financial entity that maintains private and sensitive consumer information, Defendant further understood the importance of safeguarding PII. Yet Defendant disregarded the rights of Plaintiffs and Class Members by intentionally, willfully, recklessly, or negligently failing to take and implement adequate and reasonable measures to ensure that Plaintiffs' and Class members' PII was safeguarded, failing to take available steps to prevent an unauthorized disclosure of data, and failing to follow applicable, required, and appropriate protocols, policies, and procedures regarding the encryption of data, even for internal use. As a result, the PII of Plaintiffs and Class Members was compromised through access to and exfiltration by an unknown and unauthorized third party. Plaintiffs and Class Members have a continuing interest in ensuring that their information is and remains safe, and they are entitled to injunctive and other equitable relief.

16.     Plaintiffs by this action seek compensatory damages together with injunctive relief to remediate Defendant's failures to secure their and the other Class Members' PII, and to provide damages for, among other things, Plaintiffs and Class Members to secure identity theft insurance, and credit repair services for Class Members' respective lifetimes to protect them from identity theft and fraud.

---

[7] Community Loan Servicing, LLC, *Privacy Notice* (Sept. 2020), https://www.communityloanservicing.com/wp-content/uploads/NL009-CLS-Privacy-Notice-2020.pdf  (last visited Sept. 28, 2022).

## II.  PARTIES

### Plaintiff Judith Cefaly

17.     Plaintiff Judith Cefaly is a resident and citizen of the State of Pennsylvania and intends to remain domiciled in and a citizen of the State of Pennsylvania.

18.     Plaintiff Cefaly received a letter dated August 16, 2022, from Defendant CLS concerning the Data Breach. The letter stated that unauthorized actors gained access to files on CLS's network. The compromised files contained her name and Social Security number, and information provided in connection with a loan application, loan modification, or other loan services may have also been impacted.

### Plaintiff Cathryne Fera

19.     Plaintiff Cathryne Fera is a resident and citizen of the State of Illinois and intends to remain domiciled in and a citizen of the State of Illinois.

20.     Plaintiff Fera received a letter dated August 16, 2022, from Defendant CLS concerning the Data Breach. The letter stated that unauthorized actors gained access to files on CLS's network. The compromised files contained her name and Social Security number, and information provided in connection with a loan application, loan modification, or other loan services may have also been impacted.

### Plaintiff Albert Brumitt

21.     Plaintiff Albert Brumitt is a resident and citizen of the State of Illinois and intends to remain domiciled in and a citizen of the State of Illinois.

22.     Plaintiff Brumitt received a letter dated August 16, 2022, from Defendant CLS concerning the Data Breach.  The letter stated unauthorized actors gained access to CLS's network containing his name, Social Security number, and information provided in connection with a loan application, loan modification, or other loan services may have also been impacted.

*Defendant Community Loan Servicing, LLC*

23.     Defendant Community Loan Servicing, LLC is a limited liability company formed in Delaware with a principal place of business located at 4425 Ponce de Leon Boulevard, 5th Floor, Coral Gables, Florida, 33146.

24.     Defendant is a mortgage loan servicing and loan management company operating throughout the country.

### III.   JURISDICTION AND VENUE

25.     This Court has original jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), because this is a class action involving more than 100 Class Members and because the amount in controversy exceeds $5,000,000.00 exclusive of interest and costs. Moreover, the minimal diversity requirement is met as Plaintiffs, Class Members, and Defendant are citizens of different states.

26.     The Court has personal jurisdiction over Defendant CLS because its principal place of business is in Coral Gables, FL and its contacts within Florida are continuous and systematic.

27.     Venue is proper in this district under 28 U.S.C. §§ 1391 because CLS is headquartered and regularly conducts business in this District, and a substantial part of the conduct giving rise to Plaintiffs' claims occurred in this District.

### IV.   FACTUAL ALLEGATIONS

*Background*

28.     Plaintiffs were required to entrust their most sensitive and confidential information to the care of Defendant, including, but not limited to, name, Social Security number, and additional information typically provided in connection with a loan application, loan modification, or other loan services. Much of the information Plaintiffs and Class Members entrusted to Defendant is static, does not change, and can be used to commit myriad financial crimes.

29.     In providing services to Plaintiffs and Class Members, Defendant generated and retained additional sensitive personal information about Plaintiffs and Class Members, including information concerning its loan services and information provided to them by its affiliates and sub servicers.

30.     Sophisticated companies like Defendant are aware of the different types of threat actors acting across the Internet and the type of criminal cybersecurity acts they employ for profit. Accordingly, it is imperative that Defendant guard against those criminal exploits.

31.     Plaintiffs and Class Members, as current and former customers of Defendant or its affiliates, relied on Defendant to keep their PII confidential and securely maintained, to use this information for business purposes only, and to make only authorized disclosures of this information.

32.     Defendant had a duty to adopt reasonable measures to protect Plaintiffs' and Class Members' PII from involuntary disclosure to third parties. Defendant collected, maintained, and profited from information that it knew to be private and sensitive, and it was aware of the consequences to Plaintiffs and Class Members if it failed to adequately protect that information. Defendant breached its duty to Plaintiffs and Class Members and allowed an attacker access to its systems for months without detection.

33.     Defendant knew that the PII it maintained was a target of data thieves and that it had a duty to protect Plaintiffs' and Class Members' PII from unauthorized access. For example, Defendant posts a Privacy Policy on its website.[8] The Privacy Policy promises consumers that Defendant, "protect[s] your personal information from unauthorized access and use, [and] use[s] security measures that comply with federal law. These measures include computer safeguards and

---

[8] *Id.*

secured files and buildings." CLS also states: "As your mortgage company, we believe it is our responsibility to secure any sensitive information pertaining to your mortgage within our company"; and, "We keep your loan information private and secure. We follow the highest privacy and security standards."[9] Class Members, including Plaintiff Cefaly, reviewed CLS's Privacy Policy at the time CLS became the loan servicer, and understood that this meant CLS would adequately protect her PII.

34.     The Privacy Policy also acknowledges that Defendant collects consumer data directly from consumers and via its affiliates. Specifically, CLS acknowledges that it collects information when consumers pay bills or apply for a loan or provide income or employment information.[10]

35.     The Privacy Policy also provides a list of instances in which disclosure of PII could be made to its affiliates and other entities without prior written authorization—none of which is applicable here.[11]

---

[9]  https://communityloanservicing.com/faqs-commercial/,  (last visited Oct. 28, 2022).

[10]  https://www.communityloanservicing.com/wp-content/uploads/NL009-CLS-Privacy-Notice-2020.pdf  (last visited Sept. 28, 2022).

[11]  *Id.*  Similarly, CLS has a "Privacy" section on its website (https://communityloanservicing.com/privacy/ ) that states: (1) "Community Loan Servicing, LLC recognizes the importance of keeping the personal information you provide to us private and secure.  Community Loan Servicing, LLC has developed a comprehensive privacy policy and we use the latest technology to ensure that your personal information is secure"; and "We maintain commercially reasonable security measures to protect the personal information we collect and store from loss, misuse, destruction, or unauthorized access. Our security includes physical, administrative, and technology-based measures. We use industry-standard encryption to protect data in transit and at rest. Our internal policies and procedures impose a number of standards to safeguard the confidentiality of personal information, prohibit the unlawful disclosure of personal information, and limit access to personal information."

36.     Moreover, Defendant is a sophisticated company that knew or should have known that PII, including Social Security numbers in particular, is an invaluable commodity and a frequent target of hackers.

37.     There were a record 1,862 data breaches last year (2021), surpassing both 2020's total of 1,108 and the previous record of 1,506 set in 2017.

38.     In light of recent high profile data breaches at other industry leading companies, including, Microsoft (250 million records, December 2019), Wattpad (268 million records, June 2020), Facebook (267 million users, April 2020), Estee Lauder (440 million records, January 2020), Whisper (900 million records, March 2020), and Advanced Info Service (8.3 billion records, May 2020), Defendant knew or should have known that its electronic records would be targeted by cybercriminals.

39.     Indeed, cyberattacks have become so notorious that the FBI and U.S. Secret Service regularly issue warnings to potential targets, like CLS, so they are aware of and take appropriate measures to prepare for and are able to thwart such an attack.

40.     Despite the prevalence of public announcements of data breach and data security compromises, Defendant failed to take appropriate steps to protect the PII of Plaintiffs and Class Members from being compromised.

***The Data Breach***

41.     On or around October 27, 2021, an intruder gained unauthorized access to Defendant's network.[12] Defendant discovered the intrusion on or around December 7, 2021.[13]

---

[12] State of California Department of Justice, Rob Bonita, Attorney General, *Community Loan Servicing, LLC Notice of Data Breach* (Oct. 17, 2022), https://oag.ca.gov/ecrime/databreach/reports/sb24-556436 (last visited Sept. 28, 2022).

[13] *Id.*

Before that discovery, the intruder accessed and exfiltrated the PII of over one hundred thousand CLS customers.

42.     Over eight months later, on or around August 16, 2022, Defendant began notifying various Attorneys General, Plaintiffs, and Class Members of the Data Breach.

43.     The notice letters slightly varied in length and detail provided. The sample letter to the California Attorney General's Office[14] stated in part:

> Community Loan Servicing LLC ("CLS") understands the importance of protecting the information we maintain. We are writing to inform you of an incident that involved some of your information. This notice explains the incident, measures we have taken, and steps that you may consider taking.
>
> **What Happened?**
>
> CLS currently or previously serviced your mortgage loan. A security incident involving unauthorized access to our file servers was identified in early December 2021. Steps were immediately taken to contain the incident, notify law enforcement, and a forensic investigation firm was engaged. The investigation determined that an unauthorized person obtained access to files on our file storage servers from October 27, 2021 to December 7, 2021. The accessed files were then reviewed by our investigation team to identify the content.
>
> **What Information Was Involved?**
>
> On [January 31, 2022], the review process determined that some of your information, including your name and Social Security number, were included in the files. For some, the accessed files may also have included information provided in connection with a loan application, loan modification, or other items regarding loan servicing. The additional loan related information in the files is not the same for all individuals.
>
> **What We Are Doing.**
>
> We regret that this incident occurred and apologize for any inconvenience. Additional steps are being taken to further enhance

---

[14] *Id.*

our existing security measures.[15]

44.     CLS admits that unauthorized third persons accessed and removed from its network systems sensitive information about current and former customers of CLS and its affiliates, including, without limitation: "name and Social Security number" and, for some, "information provided in connection with a loan application, loan modification, or other items regarding loan servicing."[16]

45.     Plaintiffs' and Class Members' unencrypted information may be leaked onto the dark web, and/or may fall into the hands of companies that will use the detailed PII for targeted marketing without the approval of the affected customers.  Unauthorized individuals can access the PII of Plaintiffs and Class Members now that it has been stolen.

46.     Defendant did not use reasonable security procedures and practices suitable or adequate to protect the sensitive, unencrypted information it was maintaining for consumers, causing the access and/or exfiltration of the PII of hundreds of thousands of current and former customers.

**Defendant Acquired, Collected and Stored Plaintiffs' and Class Members' PII.**

47.     Defendant acquired, collected, and stored the PII of its current and former customers and those of its affiliates.

48.     As a condition of receiving services from Defendant (by way of its affiliate mortgage lenders), CLS required that consumers entrust it with highly confidential PII.

49.     By obtaining, collecting, and storing Plaintiffs' and Class Members' PII, Defendant assumed legal and equitable duties and knew or should have known that it was responsible for

---

[15] *Id.*

[16] *Id.*

protecting Plaintiffs' and Class Members' PII from disclosure.

50.    Plaintiffs and Class Members have taken reasonable steps to maintain the confidentiality of their PII. Plaintiffs and Class Members relied on Defendant to keep their PII confidential and securely maintained, to use this information for business purposes only, and to make only authorized disclosures of this information.

### *Securing PII and Preventing Breaches*

51.    Defendant could have prevented this Data Breach by properly securing and encrypting Plaintiffs' and Class Members' PII. Additionally, Defendant could have destroyed data, including old data that Defendant had no legal right or responsibility to retain.

52.    Defendant's negligence in safeguarding Plaintiffs' and Class Members' PII is exacerbated by the repeated warnings and alerts directed to protecting and securing sensitive data, especially sensitive financial data.

53.    Despite the prevalence of public announcements of data breach and data security compromises, Defendant failed to take appropriate steps to protect the PII of Plaintiffs and Class Members from being compromised.

54.    The Federal Trade Commission ("FTC") defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority."[17] The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, [and]

---

[17] 17 C.F.R. § 248.201 (2013).

-13-

employer or taxpayer identification number."[18]

55.     The ramifications of Defendant's failure to keep secure Plaintiffs' and Class Members' PII are long lasting and severe. Once Social Security numbers and other PII have been stolen, fraudulent use of that information and damage to victims may continue for years.

### Value of Personal Identifiable Information

56.     PII is very valuable to criminals, as evidenced by the prices they will pay for it on the dark web. Numerous sources cite dark web pricing for stolen identity credentials. For example, personal information is sold at prices ranging from $40 to $200, and bank details have a price range of $50 to $200.[19] Experian reports that a stolen credit or debit card number can sell for $5 to $110 on the dark web.[20] Criminals also can purchase access to entire sets of information obtained from company data breaches from $900 to $4,500.[21]

57.     Social Security numbers are among the most sensitive kind of personal information to have stolen because they may be put to a variety of fraudulent uses and are difficult for an individual to change. The Social Security Administration stresses that the loss of an individual's Social Security number, as is the case here, can lead to identity theft and extensive financial fraud:

> A dishonest person who has your Social Security number can use it to get other personal information about you. Identity thieves can use your number and your good credit to apply for more credit in your name. Then, they use the credit cards and don't pay the bills, it

---

[18] *Id.*

[19]  *Your Personal Data Is for Sale on the Dark Web. Here's How Much It Costs,* Digital Trends, Oct. 16, 2019, *available at:* https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/  (last visited Oct. 17, 2022).

[20] *Here's How Much Your Personal Information Is Selling for on the Dark Web*, Experian, Dec. 6, 2017, *available at:* https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/  (last visited Oct. 17, 2022).

[21] *In the Dark*, VPNOverview, 2019, *available at:* https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/  (last visited Oct. 17, 2022).

damages your credit. You may not find out that someone is using your number until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you never bought. Someone illegally using your Social Security number and assuming your identity can cause a lot of problems.[22]

58.     What is more, it is no easy task to change or cancel a stolen Social Security number. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. In other words, preventive action to defend against potential misuse of a Social Security number is not permitted; an individual instead must show evidence of actual, ongoing fraud to obtain a new number.

59.     Even then, a new Social Security number may not be effective. According to Julie Ferguson of the Identity Theft Resource Center, "The credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[23]

60.     Based on the foregoing, the information compromised in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach because, in that situation, victims can cancel or close credit and debit card accounts. The information compromised in this Data Breach is impossible to "close" and difficult, if not impossible, to change—e.g., name and Social Security number.

61.     This data commands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "Compared to credit card information, personally identifiable information and Social Security numbers are worth more than 10x on the

---

[22] Social Security Administration, *Identity Theft and Your Social Security Number*, *available at*: https://www.ssa.gov/pubs/EN-05-10064.pdf  (last accessed Oct. 17, 2022).
[23] Bryan Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), *available at*: http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millionsworrying-about-identity-theft  (last visited Oct. 17, 2022).

black market."[24]

62.     Among other forms of fraud, identity thieves may obtain driver's licenses, government benefits, medical services, and housing or even give false information to police.

63.     The PII of Plaintiffs and Class Members was taken by hackers to engage in identity theft and/or to sell it to other criminals who will purchase the PII for that purpose. The fraudulent activity resulting from the Data Breach may not come to light for years.

64.     Further, there may be a time lag between when harm occurs and when it is discovered and also between when PII is stolen and when it is used. According to the U.S. Government Accountability Office ("GAO"), which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[25]

65.     At all relevant times, Defendant knew, or reasonably should have known, of the importance of safeguarding its current and former customers' PII, including Social Security numbers and financial account information, and of the foreseeable consequences that would occur if Defendant's data security system was breached, including, specifically, the significant costs that would be imposed on its current and former customers as a result of such a breach.

66.     Plaintiffs and Class Members now face a lifetime of constant surveillance of their

---

[24] Time Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, IT World, (Feb. 6, 2015), *available at*: https://www.networkworld.com/article/2880366/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html  (last visited Oct. 17, 2022).
[25] *Report to Congressional Requesters*, GAO, at 29 (June 2007), *available at:* http://www.gao.gov/new.items/d07737.pdf  (last visited Oct. 17, 2022).

financial and personal records, monitoring, and loss of rights. The Class is incurring and will continue to incur such damage in addition to any fraudulent use of their PII.

67.     Defendant was, or should have been, fully aware of the unique type and the significant volume of data on its network, comprising millions of individual's detailed and confidential personal information and, thus, the significant number of individuals who would be harmed by the exposure of the unencrypted data.

68.     Although Defendant has offered identity monitoring services for a limited time through Kroll, the offered services are inadequate to protect Plaintiffs and Class Members from the threats they face for years to come, particularly in light of the highly sensitive nature of the PII at issue here.

69.     The injuries to Plaintiffs and Class Members were directly and proximately caused by Defendant's failure to implement or maintain adequate data security measures for the PII of its current and former customers.

## V.   <u>PLAINTIFF-SPECIFIC ALLEGATIONS</u>

### *Plaintiff Judith Cefaly's Experience*

70.     Beginning in 2020, CLS became the servicer for the residential mortgage on Plaintiff Cefaly's home. As a condition to receiving loan services, Plaintiff Cefaly provided her PII, which was then entered into CLS's database and maintained by CLS. Plaintiff Cefaly reviewed CLS's Privacy Policy at the time and understood that CLS agreed to protect and keep private her sensitive, personal private information, including her Social Security number. Ms. Cefaly understood that CLS promised to protect her PII "from unauthorized access and use," and that CLS uses "security measures that comply with federal law." Moreover, Plaintiff Cefaly relied on CLS's representations in its Privacy Policy when she chose to continue using CLS as her loan servicer.

71.     Plaintiff Cefaly greatly values her privacy and PII, especially when receiving loan

and other financial services. Prior to the Data Breach, Plaintiff Cefaly took reasonable steps to maintain the confidentiality of her PII.

72.     Plaintiff Cefaly received a letter dated August 16, 2022 from Defendant CLS concerning the Data Breach. The letter stated that unauthorized actors gained access to files on CLS's network that contained her name and Social Security number, and potentially, information provided in connection with a loan application, loan modification, or other items regarding loan servicing.

73.     Recognizing the present, immediate, and substantially increased risk of harm Plaintiff Cefaly faces, Defendant offered her a one-year subscription to a credit monitoring service. However, Plaintiff Cefaly has not signed up for the program, as she does not trust that CLS's chosen vendor can protect her information.

74.     Since the Data Breach, Plaintiff Cefaly has experienced multiple forms of identity fraud.

75.     Beginning in or around July 2022, Plaintiff Cefaly discovered that her telephone number's caller identification had been changed to a different name as part of a scheme by an individual attempting to flee a bail bond and required court appearance. Her telephone's caller ID identified her number as belonging to a Mr. Collins, whom she presumes provided her telephone number to his bail bondsman as she began getting telephone calls, in or around August 2022, from a bail bonds company threatening to come to her residence to arrest Mr. Collins. Plaintiff has missed important calls and devoted significant amounts of time to addressing this fraudulent activity in addition to suffering emotional distress and fear that a bounty hunter may appear at her residence.

76.     Plaintiff Cefaly has also had an unauthorized third-party contact Defendant CLS and request a deferment on the mortgage on her former marital home in her name, despite her not

having resided in that home or having been responsible for paying the mortgage since her separation from her now ex-husband. She believes this fraud resulted from the Data Breach because it occurred relatively soon after the Data Breach and relates directly to CLS.

77.     Plaintiff Cefaly has also experienced fraud in the form of unauthorized charges on her credit cards and PayPal accounts.  As a result, she was required to contact her bank and PayPal to report the fraudulent charges. She believes the unauthorized charges are a result of the Data Breach given that they occurred relatively soon after the Data Breach, and she has had no other previous fraudulent charges on her accounts.

78.     In the past few months, Plaintiff Cefaly spent time in connection with reporting the fraudulent charges to her bank; reviewing her bank statements, credit card statements, and credit reports; reviewing her emails and other personal information for suspicious activity; signing up for credit monitoring; and taking other steps in an attempt to mitigate the harm caused as a result of the Data Breach.

79.     Plaintiff Cefaly estimates that she has spent more than five hours on the foregoing mitigation steps. Plaintiff spent this time at CLS's direction. Indeed, in the notice letter Plaintiff received, CLS directed Plaintiff to spend time mitigating her losses by "reviewing your account statements and free credit reports for unauthorized activity."

80.     The Data Breach has caused Plaintiff Cefaly to suffer fear, anxiety, and stress, which has been compounded by the fact that CLS has not been forthright with information about the Data Breach.

81.     Plaintiff Cefaly plans on taking additional time-consuming, necessary steps to help mitigate the harm caused by the Data Breach, including continually reviewing her bank, credit, and other accounts for any unauthorized activity.

82.     Additionally, Plaintiff Cefaly is very careful about sharing her PII. She has never

knowingly transmitted unencrypted PII over the internet or any other unsecured source.

83.     Plaintiff Cefaly stores any documents containing her PII in a safe and secure location or destroys the documents. Moreover, she diligently chooses unique usernames and passwords for her various online accounts.

84.     Plaintiff Cefaly has a continuing interest in ensuring that her PII, which, upon information and belief, remains in Defendant's possession, is protected, and safeguarded from future breaches.

### *Plaintiff Cathryne Fera's Experience*

85.     CLS was a servicer for the residential mortgage on Plaintiff Fera's home. As a condition to receiving loan services from CLS, Plaintiff Fera, provided her PII, which was then entered into CLS's database and maintained by CLS.

86.     Plaintiff Fera greatly values her privacy and PII, especially when receiving loan and other financial services. Before the Data Breach, Plaintiff Fera took reasonable steps to maintain the confidentiality of her PII.

87.     Plaintiff Fera received a letter dated August 16, 2022 from Defendant CLS concerning the Data Breach. The letter stated that unauthorized actors gained access to files on CLS's network that contained her name and Social Security number, and potentially included information provided in connection with a loan application, loan modification, or other items regarding loan servicing.

88.     Recognizing the present, immediate, and substantially increased risk of harm Plaintiff Fera faces, Defendant offered her a one-year subscription to a credit monitoring service. However, Plaintiff Fera has not signed up for the program, as she does not trust that CLS's chosen vendor can protect her information.

89.     Since the Data Breach, Plaintiff Fera has experienced multiple forms of identity fraud.

90.     Beginning in or around January 2022 and continuing through May 2022, Plaintiff Fera had a fraudulent, unauthorized, charge of $19.00 placed on her credit card each month during this five-month period, for a total of $95.00 in fraudulent charges. Plaintiff Fera discovered these fraudulent charges in May of 2022.

91.     In the past few months, Plaintiff Fera spent time in connection with reporting the fraudulent charges to her credit card; reviewing her bank statements, credit card statements, and credit reports; reviewing her emails and other personal information for suspicious activity; signing up for credit monitoring; and taking other steps in an attempt to mitigate the harm caused as a result of the Data Breach.

92.     Plaintiff Fera estimates that she has spent more than four hours on the foregoing mitigation steps. Plaintiff spent this time at CLS's direction. Indeed, in the notice letter Plaintiff received, CLS directed Plaintiff to spend time mitigating her losses by "reviewing your account statements and free credit reports for unauthorized activity."

93.     The Data Breach has caused Plaintiff Fera to suffer fear, anxiety, and stress, which has been compounded by the fact that CLS has not been forthright with information about the Data Breach.

94.     Plaintiff Fera plans on taking additional time-consuming, necessary steps to help mitigate the harm caused by the Data Breach, including continually reviewing her bank, credit, and other accounts for any unauthorized activity.

95.     Additionally, Plaintiff Fera is very careful about sharing her PII. She has never knowingly transmitted unencrypted PII over the internet or any other unsecured source.

96.     Plaintiff Fera stores any documents containing her PII in a safe and secure location

or destroys the documents. Moreover, she diligently chooses unique usernames and passwords for her various online accounts.

97.     Plaintiff Fera has a continuing interest in ensuring that her PII, which, upon information and belief, remains in Defendant's possession, is protected, and safeguarded from future breaches.

### *Plaintiff Albert Brumitt's Experience*

98.     CLS was a servicer for the residential mortgage on Plaintiff Brumitt's home.  As a condition to receiving services from CLS, Plaintiff Brumitt provided his PII, which was then entered into CLS's database and maintained by CLS. Plaintiff Brumitt reviewed CLS's Privacy Policy at the time he signed up with it and understood that CLS agreed to protect and keep private his sensitive, personal private information, including his Social Security number. Mr. Brumitt understood that CLS promised to protect his PII "from unauthorized access and use," and that CLS uses "security measures that comply with federal law." Moreover, Plaintiff Brumitt relied on CLS's representations in its Privacy Policy when he chose to use CLS as his loan servicer.

99.     Plaintiff Brumitt greatly values his privacy and PII, especially when receiving loan and financial services. Prior to the Data Breach, Plaintiff Brumitt took reasonable steps to maintain the confidentiality of his PII.

100.    Plaintiff Brumitt received a letter dated August 16, 2022 from Defendant CLS concerning the Data Breach. The letter stated that unauthorized actors gained access to its network containing Plaintiff's name and Social Security number, and, potentially, information he provided in connection with a loan application, loan modification, or other items regarding loan servicing.

101.    Recognizing the present, immediate, and substantially increased risk of harm Plaintiff Brumitt faces, Defendant offered him a one-year subscription to a credit monitoring service and encouraged him to freeze his credit.

102.     Since learning of the Data Breach, Plaintiff Brumitt has spent additional time reviewing his bank statements and credit cards. Nearly every single day since learning of the Breach, Plaintiff calls his bank and reviews his financial records and all charges with the clerk. This process takes roughly an hour every day.

103.     Plaintiff Brumitt has experienced an increase of spam calls, text messages and emails after the Data Breach, including obvious phishing attempts.

104.     The Data Breach has caused Plaintiff Brumitt to suffer fear, anxiety, and stress, which has been compounded by the fact that CLS has not been forthright with information about the Data Breach.

105.     Plaintiff Brumitt plans on taking additional time-consuming, necessary steps to help mitigate the harm caused by the Data Breach, including continually reviewing his depository, credit, and other accounts for any unauthorized activity.

106.     Additionally, Plaintiff Brumitt is very careful about sharing his PII. He has never knowingly transmitted unencrypted PII over the internet or any other unsecured source.

107.     Plaintiff Brumitt stores any documents containing his PII in a safe and secure location or destroys the documents. Moreover, he diligently chooses unique usernames and passwords for his various online accounts.

108.     Plaintiff Brumitt has a continuing interest in ensuring that his PII, which, upon information and belief, remains in Defendant's possession, is protected, and safeguarded from future breaches.

### *Plaintiffs' and Class Members Injuries*

109.     As a direct and proximate result of Defendant's conduct, Plaintiffs and Class Members are presently experiencing and will continue experiencing actual harm from fraud and identity theft.

110.     Plaintiffs and Class Members are presently experiencing substantial risk of out-of-pocket fraud losses, such as loans opened in their names, tax return fraud, utility bills opened in their names, and similar identity theft.

111.     Plaintiffs and Class Members face a substantial risk of being targeted for future phishing, data intrusion, and other illegal schemes based on their PII as potential fraudsters could use that information to target such schemes more effectively to Plaintiffs and Class Members.

112.     Plaintiffs and Class Members also may incur out-of-pocket costs for protective measures such as credit monitoring fees (for any credit monitoring obtained in addition to or in lieu of the inadequate monitoring offered by Defendant), credit report fees, credit freeze fees, and similar costs directly or indirectly related to the Data Breach.

113.     Plaintiffs and Class Members also suffered a loss of value of their PII when it was acquired by the cyber thieves in the Data Breach.

114.     Plaintiffs and Class Members were also damaged via benefit-of-the-bargain damages. Plaintiffs and Class Members overpaid for a service that was intended to be accompanied by adequate data security but was not. Part of the price Plaintiffs and Class Members paid for Defendant's services was intended to be used by Defendant to fund adequate security of Defendant's computer property and protect Plaintiffs' and Class Members' PII. Thus, Plaintiffs and the Class Members did not get what they paid for.

115.     Plaintiffs and Class Members have spent and will continue to spend significant amounts of time monitoring their financial and medical accounts and records for misuse. Indeed, Defendant's own notice of data breach provides instructions to Plaintiffs and Class Members about all the time that they will need to spend monitoring their own accounts and statements received from healthcare providers and health insurance plans.

116.     Plaintiffs and Class Members have suffered actual injury as a direct result of the Data Breach. Many victims suffered ascertainable losses in the form of out-of-pocket expenses and the value of their time reasonably incurred to remedy or mitigate the effects of the Data Breach relating to:

    a.   Finding fraudulent loans, insurance claims, tax returns, and/or government benefit claims;

    b.   Purchasing credit monitoring and identity theft prevention;

    c.   Placing "freezes" and "alerts" with credit reporting agencies;

    d.   Spending time on the phone with or at a financial institution or government agency to dispute fraudulent charges and/or claims;

    e.   Contacting financial institutions and closing or modifying financial accounts; and

    f.   Closely reviewing and monitoring Social Security number, bank accounts, payment card statements, and credit reports for unauthorized activity for years to come.

117.     Moreover, Plaintiffs and Class Members have an interest in ensuring that their PII, which is believed to remain in the possession of Defendant, is protected from further breaches by the implementation of security measures and safeguards, including but not limited to, making sure that the storage of data or documents containing sensitive and confidential personal, health, and/or financial information is not accessible online, that access to such data is password-protected, and that such data is properly encrypted.

118.     Further, because of Defendant's conduct, Plaintiffs and Class Members are forced to live with the anxiety that their PII may be disclosed to the entire world, thereby subjecting them to embarrassment and depriving them of any right to privacy whatsoever.

## VI.   <u>CLASS ALLEGATIONS</u>

119.    Pursuant to Fed. R. Civ. P. 23(a), 23(b)(1), 23(b)(2), 23(b)(3), 23(c)(4) and/or 23(c)(5), Plaintiffs bring this Action on behalf of themselves and on behalf of all other persons similarly situated. Plaintiffs propose the following Class and Subclass definitions, subject to amendment as appropriate:

> All individuals residing in the United States whose PII was accessed or exfiltrated during the Data Breach announced by CLS in 2022. (the "Class").

> All individuals residing in Pennsylvania whose PII was accessed or exfiltrated during the Data Breach announced by CLS in 2022 (the "Pennsylvania Subclass").

> All individuals residing in Illinois whose PII was accessed or exfiltrated during the Data Breach announced by CLS in 2022 ("The Illinois Subclass").

120.    The Subclasses are collectively referred to herein as the "State Subclasses."

121.    Excluded from the Class and the State Subclasses are the following individuals and/or entities: Defendant  and Defendant's parents, subsidiaries, members, affiliates, officers and directors, and any entity in which a Defendant has a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; any and all federal, state or local governments, including but not limited to their departments, agencies, divisions, bureaus, boards, sections, groups, counsels and/or subdivisions; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members and staff.

122.    Plaintiffs reserve the right to modify or amend the definitions of the proposed Class and Subclasses before the Court determines whether certification is appropriate.

123.    <u>Numerosity</u>. Consistent with Fed. R. Civ. P. 23(a)(1), the Class Members are so numerous that their joinder is impracticable. Defendant's public statements indicate that the number of Class Members exceeds one hundred thousand. The number and identities of Class Members can be ascertained through Defendant's records.

124.   <u>Commonality</u>. Consistent with Fed. R. Civ. P. 23(a)(2) and (b)(3), questions of law and fact common to the Class exist and predominate over any questions affecting only individual Class Members. These questions include but are not limited to:

a.   Whether Defendant failed to adequately safeguard the PII of Plaintiffs and Class Members;

b.   Whether and to what extent Defendant had a duty to protect the PII of Plaintiffs and Class Members;

c.   Whether Defendant had duties not to disclose the PII of Plaintiffs and Class Members to unauthorized third parties;

d.   Whether Defendant had a duty not to use the PII of Plaintiffs and Class Members for non-business purposes;

e.   Whether and when Defendant learned of the Data Breach;

f.   Whether Defendant failed to promptly notify Plaintiffs and Class Members that their PII had been compromised;

g.   Whether Defendant failed to implement and maintain reasonable security procedures and practices adequate to protect the information compromised in the Data Breach, considering its nature and scope;

h.   Whether Defendant has adequately addressed and fixed the vulnerabilities which permitted the Data Breach to occur;

i.   Whether Defendant violated state statutes as alleged herein;

j.   Whether Defendant engaged in unfair, unlawful, or deceptive practices, including by failing to safeguard the PII of Plaintiffs and Class Members;

k.   Whether Plaintiffs and Class Members are entitled to damages as a result of Defendant's wrongful conduct;

l.      Whether Plaintiffs and Class Members are entitled to restitution as a result of Defendant's wrongful conduct; and

m.      Whether Plaintiffs and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of the Data Breach.

125.    Typicality. Consistent with Fed. R. Civ. P. 23(a)(3), Plaintiffs' claims are typical of those of other Class Members because all had their PII compromised as a result of the Data Breach due to Defendant's misfeasance, and their claims arise under the same legal doctrines.

126.    Policies Generally Applicable to the Class. As provided under Fed. R. Civ. P. 23(b)(2), Defendant has acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct in relation to the Class and making final injunctive and corresponding declaratory relief appropriate with respect to the Class as a whole. Defendant's policies challenged herein apply to and affect Class Members uniformly, and Plaintiffs challenge these policies by reference to Defendant's conduct with respect to the Class as a whole.

127.    Adequacy of Representation. Consistent with Fed. R. Civ. P. 23(a)(4), Plaintiffs will fairly and adequately represent and protect the interests of the Class Members. No Plaintiff has a disabling conflict of interest with any other Member of the Class. Plaintiffs seek no relief that is antagonistic or adverse to the Members of the Class, and the infringement of rights and the damages they have suffered are typical of other Class Members. Plaintiffs also have retained counsel experienced in complex class action litigation, and they intend to prosecute this action vigorously.

128.    Superiority and Manageability. Consistent with Fed. R. Civ. P. 23(b)(3), class treatment is superior to all other available methods for the fair and efficient adjudication of this controversy. Among other things, it will permit a large number of Class Members to prosecute

their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require. Moreover, class action treatment will permit the adjudication of relatively modest claims by Class Members who could not individually afford to litigate a complex claim against a large corporation such as Defendant. Prosecuting the claims pleaded herein as a class action will eliminate the possibility of repetitive litigation. There will be no material difficulty in the management of this action as a class action.

129.    Particular issues, such as questions related to Defendant's liability, are also appropriate for certification under Fed. R. Civ. P. 23(c)(4) because the resolution of such common issues would materially advance the resolution of this matter and the parties' interests therein.

130.    Class certification is also appropriate under Fed. R. Civ. P. 23(b)(1), in that the prosecution of separate actions by the individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Defendant. Prosecution of separate actions by Class Members also would create the risk of adjudications with respect to individual Class Members that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

**COUNT I**
**NEGLIGENCE**
**(On Behalf of Plaintiffs and the Class)**

131.    Plaintiffs re-allege and incorporate paragraphs 1-130 as if fully set forth herein.

132.    Plaintiffs bring this claim on behalf of themselves and the Class.

133.    As a condition of receiving their mortgages or related services from Defendant or its partners or affiliates, Plaintiffs and the Class were obligated to provide and entrust it with certain

PII, including their name, Social Security number, and other information provided in connection with a loan application, loan modification, or other items regarding loan servicing.

134.    Plaintiffs and the Class entrusted their PII to Defendant on the premise and with the understanding that Defendant would safeguard their information, use their PII for business purposes only, and/or not disclose their PII to unauthorized third parties.

135.    By undertaking the duty to maintain and secure this data, sharing it and using it for commercial gain, Defendant had a duty of care to use reasonable means to secure and safeguard its systems and networks—and Plaintiffs, Class and Subclass members' PII held within it—to prevent disclosure of the information, and to safeguard the information from cyber theft.

136.    Defendant had full knowledge of the sensitivity of the PII and the types of harm that Plaintiffs and the Class could and would suffer if the PII were wrongfully disclosed or obtained by unauthorized parties.

137.    Defendant knew or reasonably should have known that its failure to exercise due care in the collecting, storing, and using of consumers' PII involved an unreasonable risk of harm to Plaintiffs and the Class, including harm that foreseeably could occur through the criminal acts of a third party.

138.    Defendant had a duty to exercise reasonable care in safeguarding, securing, and protecting such information from being compromised, lost, stolen, misused, and/or disclosed to unauthorized parties. This duty includes, among other things, designing, maintaining, and testing Defendant's security protocols to ensure that Plaintiffs' and Class Members' information in its possession was adequately secured and protected.

139.    Defendant also had a duty to exercise appropriate clearinghouse practices to remove former customers' or rejected loan applicants' PII that they were no longer required to retain pursuant to regulations.

140.    Defendant had a duty to have procedures in place to detect and prevent the improper access and misuse of Plaintiffs' and the Class's PII, and to employ proper procedures to prevent the unauthorized dissemination of the PII of Plaintiffs and the Class.

141.    Defendant's duty to use reasonable security measures arose as a result of the special relationship that existed between each Defendant and Plaintiffs and the Class. That special relationship arose because Plaintiffs and the Class entrusted Defendant with their confidential PII, a mandatory step in receiving services from Defendant. While this special relationship exists independent from any contract, it is recognized by Defendant's Privacy Policies, as well as applicable laws and regulations. Specifically, Defendant actively solicited and gathered PII as part of its business and was solely responsible for and in the position to ensure that its systems were sufficient to protect against the foreseeable risk of harm to Plaintiffs, Class, and Subclass members from a resulting data breach.

142.    Defendant was subject to an "independent duty," untethered to any contract between Defendant and Plaintiffs and the Class, to maintain adequate data security.

143.    A breach of security, unauthorized access, and resulting injury to Plaintiffs and the Class was reasonably foreseeable, particularly in light of Defendant's inadequate security practices and other recent high-profile breaches.

144.    Defendant also had a common law duty to prevent foreseeable harm to others. Plaintiffs and the Class were the foreseeable and probable victims of Defendant's inadequate security practices and procedures. Defendant knew or should have known of the inherent risks in collecting and storing the PII of Plaintiffs and the Class, the critical importance of adequately safeguarding that PII, and the necessity of encrypting PII stored on Defendant's systems. It was foreseeable that Plaintiffs and Class members would be harmed by the failure to protect their personal information because hackers are known to routinely attempt to steal such information and

use it for nefarious purposes.

145.    Defendant's conduct created a foreseeable risk of harm to Plaintiffs and the Class. Defendant's wrongful conduct included, but was not limited to, its failure to take the steps and opportunities to prevent the Data Breach as set forth herein. Defendant's misconduct also included its decision not to comply with industry standards for the safekeeping of Plaintiffs' and the Class's PII, including basic encryption techniques available to Defendant.

146.    Plaintiffs and the Class had and have no ability to protect their PII that was in, and remains in, Defendant's possession.

147.    Defendant was in a position to effectively protect against the harm suffered by Plaintiffs and the Class as a result of the Data Breach.

148.    Defendant had and continues to have a duty to adequately disclose that the PII of Plaintiffs and the Class within Defendant's possession was compromised, how it was compromised, and precisely the types of data that were compromised and when. Such notice was necessary to allow Plaintiffs and the Class to take steps to prevent, mitigate, and repair any identity theft and the fraudulent use of their PII by third parties.

149.    Defendant has admitted that the PII of Plaintiffs and the Class was wrongfully accessed by unauthorized third persons as a result of the Data Breach.

150.    Defendant, through its actions and inaction, unlawfully breached its duties to Plaintiffs and the Class by failing to implement industry protocols and exercise reasonable care in protecting and safeguarding the PII of Plaintiffs and the Class when the PII was within Defendant's possession or control.

151.    Defendant improperly and inadequately safeguarded the PII of Plaintiffs and the Class in deviation of standard industry rules, regulations, and practices at the time of the Data Breach.

152.     Defendant failed to heed industry warnings and alerts to provide adequate safeguards to protect its current and former customers' PII in the face of increased risk of theft.

153.     Defendant, through its actions and/or omissions, unlawfully breached its duty to Plaintiffs and the Class by failing to have appropriate procedures in place to detect and prevent dissemination of its current and former customers' PII.

154.     Defendant breached its duty to exercise appropriate clearinghouse practices by failing to remove consumers' PII they were no longer required to retain pursuant to regulations.

155.     Defendant, through its actions and/or omissions, unlawfully breached its duty to adequately and timely disclose to Plaintiffs and the Class the existence and scope of the Data Breach.

156.     But for Defendant's wrongful and negligent breach of duties owed to Plaintiffs and the Class, the PII of Plaintiffs and the Class would not have been compromised.

157.     There is a close causal connection between (a) Defendant's failure to implement security measures to protect the PII of Plaintiffs and the Class and (b) the harm or risk of imminent harm suffered by Plaintiffs and the Class. Plaintiffs' and the Class's PII was accessed and exfiltrated as the direct and proximate result of Defendant's failure to exercise reasonable care in safeguarding such PII by adopting, implementing, and maintaining appropriate security measures.

158.     Additionally, Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce," including, as interpreted, and enforced by the FTC, the unfair act or practice of businesses, such as Defendant, of failing to implement reasonable measures to protect PII. The FTC Act and related authorities form part of the basis of Defendant's duty in this regard.

159.     Defendant violated Section 5 of the FTC Act by failing to use reasonable measures to protect PII and not complying with applicable industry standards, as described in detail herein. Defendant's conduct was particularly unreasonable given the nature and amount of PII it obtained

and stored and the foreseeable consequences of the damages that would result to Plaintiffs and the Class.

160.     Defendant's violation of Section 5 of the FTC Act constitutes negligence *per se*.

161.     Plaintiffs and the Class are within the class of persons that the FTC Act was intended to protect.

162.     The harm that occurred as a result of the Data Breach is the type of harm the FTC Act was intended to guard against. The FTC has pursued enforcement actions against businesses, which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiffs and the Class.

163.     As a direct and proximate result of Defendant's negligence and negligence *per se*, Plaintiffs and the Class have suffered and will suffer injury, including but not limited to: (i) actual identity theft; (ii) the loss of the opportunity to control how their PII is used; (iii) the compromise, publication, and/or theft of their PII; (iv) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their PII for Plaintiffs' and Class Members' respective lifetimes; (v) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the present and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from fraud and other identity theft; (vi) costs associated with placing freezes on credit reports; (vii) the continued risk to their PII, which remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the current and former customers' PII in its continued possession; and (viii) present and future costs in the form of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the compromise of PII as a result of the Data Breach for the remainder of the lives of Plaintiffs and the Class

Members.

164.     As a direct and proximate result of Defendant's negligence and negligence *per se*, Plaintiffs and the Class have suffered and will continue to suffer other forms of injury and/or harm, including, but not limited to, anxiety, emotional distress, loss of privacy, and other economic and non-economic losses.

165.     Additionally, as a direct and proximate result of Defendant's negligence and negligence *per se*, Plaintiffs and the Class have suffered and will suffer the continued risks of exposure of their PII, which remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII in its continued possession.

166.     As a direct and proximate result of Defendant's negligence and negligence *per se*, Plaintiffs and the Class are now at an increased risk of identity theft or fraud.

167.     As a direct and proximate result of Defendant's negligence and negligence *per se*, Plaintiffs are entitled to and demand actual, consequential, and nominal damages, and injunctive relief to be determined at trial.

## COUNT II
### BREACH OF IMPLIED CONTRACT
### (On Behalf of Plaintiffs and the Class)

168.     Plaintiffs re-allege and incorporate paragraphs 1-130 as if fully set forth herein.

169.     Plaintiffs bring this claim on behalf of themselves and the Class.

170.     Defendant acquired and maintained the PII of Plaintiffs and the Class, including names, Social Security numbers, and information provided in connection with a loan application, loan modification, or other items regarding loan servicing.

171.    At the time Defendant acquired the PII of Plaintiffs and the Class, there was a meeting of the minds and a mutual understanding that Defendant would safeguard the PII and not take unjustified risks when storing the PII.

172.    Plaintiffs and the Class would not have entrusted their PII to Defendant had they known that Defendant would make the PII internet-accessible to unauthorized third parties, not encrypt sensitive data elements such as Social Security numbers, and not delete the PII that Defendant no longer had a reasonable need to maintain.

173.    Prior to the Data Breach, Defendant published a Privacy Policy, agreeing to protect and keep private financial information of Plaintiffs and the Class.

174.    Defendant further promised to comply with industry standards and to ensure that Plaintiffs' and Class Members' PII would remain protected.

175.    Implicit in the agreements between Plaintiffs and Class Members and Defendant to provide PII, was the latter's obligation to: (a) use such PII for business purposes only, (b) take reasonable steps to safeguard that PII, (c) prevent unauthorized disclosures of the PII, (d) provide Plaintiffs and Class Members with prompt and sufficient notice of any and all unauthorized access and/or theft of their PII, (e) reasonably safeguard and protect the PII of Plaintiffs and Class Members from unauthorized disclosure or uses, and (f) retain the PII only under conditions that kept such information secure and confidential.

176.    In collecting and maintaining the PII of Plaintiffs and the Class and publishing its privacy policies, Defendant entered into contracts with Plaintiffs and the Class requiring Defendant to protect and keep secure the PII of Plaintiffs and the Class.

177.    Plaintiffs and the Class fully performed their obligations under the contracts with CLS.

178.    Defendant breached the contracts it made with Plaintiffs and the Class by failing to protect and keep private information of Plaintiffs and the Class, including failing to (i) encrypt or tokenize the sensitive PII of Plaintiffs and the Class, (ii) delete such PII that Defendant no longer had reason to maintain, (iii) eliminate the potential accessibility of the PII from the internet where such accessibility was not justified, and (iv) otherwise review and improve the security of the network system that contained such PII.

179.    As a direct and proximate result of Defendant's above-described breach of implied contract, Plaintiffs and the Class have suffered (and will continue to suffer): ongoing, imminent, and impending threat of identity theft crimes, fraud, and abuse, resulting in monetary loss and economic harm; actual identity theft crimes, fraud, and abuse, resulting in monetary loss and economic harm; loss of the confidentiality of the stolen confidential data; the illegal sale of the compromised data on the dark web; expenses and/or time spent on credit monitoring and identity theft insurance; additional time spent scrutinizing bank statements, credit card statements, and credit reports; expenses and/or time spent initiating fraud alerts, credit freezes; decreased credit scores and ratings; lost work time; and other economic and non-economic harm.

180.    As a direct and proximate result of Defendant's breach of contract, Plaintiffs and Class Members are at an increased risk of identity theft or fraud.

181.    As a direct and proximate result of Defendant's breach of contract, Plaintiffs and Class Members are entitled to and demand actual, consequential, and nominal damages, and injunctive relief, to be determined at trial.

## COUNT III

**VIOLATIONS OF THE PENNSYLVANIA UNFAIR TRADE PRACTICES AND
CONSUMER PROTECTION LAW, 73 Pa. Stat. § 201-1, *et seq.*
(On Behalf of Plaintiff Judith Cefaly and the Pennsylvania Subclass)**

182.     Plaintiff Cefaly ("Plaintiff," for purposes of this Count) and the Pennsylvania Subclass re-allege and incorporate paragraphs 1-130 as if fully set forth herein.

183.     Plaintiff brings this claim on behalf of herself and the Pennsylvania Subclass.

184.     Plaintiff, Pennsylvania Subclass members, and Defendant are "persons" as defined by 73 Pa. Stat. § 201-2(2).

185.     Plaintiff and Pennsylvania Subclass members purchased goods and services in "trade" and "commerce" as defined by 73 Pa. Stat. § 201-2(3).

186.     Plaintiff and Pennsylvania Subclass members purchased goods and services primarily for personal, family, and/or household purposes under 73 Pa. Stat. § 201-9.2.

187.     Defendant engaged in "unfair methods of competition" or "unfair or deceptive acts or practices" as defined by 73 Pa. Stat. § 201-2(4) by, among other things, engaging in the following conduct:

      a.     Representing that its goods and services had characteristics, uses, benefits, and qualities that they did not have – namely that its goods, services, and business practices were accompanied by adequate data security (73 Pa. Stat. § 201-2(4)(v));

      b.     Representing that its goods and services were of a particular standard or quality when they were of another standard or quality (73 Pa. Stat. § 201-2(4)(vii));

      c.     Advertising its goods and services with intent not to sell them as advertised (73 Pa. Stat. § 201-2(4)(ix)); and

d. "Engaging in any other . . . deceptive conduct which creates a likelihood of confusion or of misunderstanding" (73 Pa. Stat. § 201-2(4)(xxi)).

188. These unfair methods of competition and unfair or deceptive acts or practices are declared unlawful by 73 Pa. Stat. § 201-3.

189. Defendant's unfair or deceptive acts and practices include but are not limited to:

a. failing to implement and maintain reasonable data security measures to protect personal information;

b. failing to identify foreseeable data security risks and remediate the identified risks;

c. failing to comply with common law duties, industry standards, and FTC guidance regarding data security; and

d. omitting and concealing the material fact that it did not have reasonable measures in place to safeguard such personal information.

190. Defendant's representations and omissions were material because they were likely to deceive reasonable consumers about the adequacy of Defendant's data security practices and ability to protect customers' personal information.

191. Defendant's intended to mislead consumers and induce them to rely on its misrepresentations and omissions, and Plaintiff and Pennsylvania Subclass members did rely on Defendant's misrepresentations and omissions relating to its data privacy and security.

192. Plaintiff and Pennsylvania Subclass members acted reasonably in relying on Defendant's misrepresentations and omissions, the truth of which they could not have discovered with reasonable diligence.

193. Had Defendant disclosed to consumers that its data security systems were not secure and, thus, were vulnerable to attack, Plaintiff and Pennsylvania Subclass members would not have given their PII to Defendant.

194. Defendant acted intentionally, knowingly, and maliciously in violating 73 Pa. Stat. § 201-1, *et seq.*, and recklessly disregarded consumers' rights.

195. As a direct and proximate result of Defendant's violation of 73 Pa. Stat. § 201-1, *et seq.*, Plaintiff and Pennsylvania Subclass members have suffered and will continue to suffer damages, injury, ascertainable losses of money or property, and monetary and non-monetary damages as alleged herein.

196. Plaintiff and Pennsylvania Subclass members seek all remedies available under 73 Pa. Stat. § 201-1, *et seq.*, including, but not limited to, injunctive relief, the damages expressly permitted under 73 Pa. Stat. § 201-9.2; actual damages or statutory damages of $100, whichever is greater; treble damages defined as three times the actual damages; reasonable attorneys' fees and litigation costs; and any other such additional relief the Court deems necessary or proper.

## COUNT IV

### VIOLATION OF THE ILLINOIS CONSUMER FRAUD ACT, 815 Ill. Comp. Stat. § 505/1, *et seq.* ("CFA") (On Behalf of Plaintiffs Fera and Brumitt and the Illinois Subclass)

197. Plaintiffs Fera and Brumitt ("Plaintiffs," for purposes of this Count) and the Illinois Subclass re-allege and incorporate paragraphs 1-130 as if fully set forth herein.

198. Plaintiffs bring this claim on behalf of themselves and the Illinois Subclass.

199. Plaintiffs and the Illinois Subclass are "consumers" as defined in 815 Ill. Comp. Stat. § 505/1(e). Plaintiffs, the Illinois Subclass, and Defendant are "persons" as defined in 815 Ill. Comp. Stat. § 505/1(c). This Count is brought against Defendant.

200.    Defendant is engaged in "trade" or "commerce," including the provision of services, as defined under 815 Ill. Comp. Stat. § 505/1(f). Defendant engages in the sale of "merchandise" (including services) as defined by 815 Ill. Comp. Stat. § 505/1(b) and (d).

201.    Defendant is engaged in deceptive and unfair acts and practices, misrepresentation, and the concealment and omission of material facts in connection with the sale and advertisement of its services in violation of the CFA, including: (1) failing to maintain adequate data security to keep Plaintiffs and the Illinois Subclass's sensitive PII from being stolen by cybercriminals and failing to comply with applicable state and federal laws and industry standards pertaining to data security, including the FTC Act; (2) failing to disclose or omitting material facts to Plaintiffs and the Illinois Subclass regarding its lack of adequate data security and inability or unwillingness to properly secure and protect the PII of Plaintiffs and the Illinois Subclass; (3) failing to disclose or omitting material facts to Plaintiffs and the Illinois Subclass about Defendant's failure to comply with the requirements of relevant federal and state laws pertaining to the privacy and security of the PII of Plaintiffs and the Illinois Subclass; and (4) failing to take proper action following the Data Breach to enact adequate privacy and security measures and protect Plaintiffs' and the Illinois Subclass's PII and other PII from further unauthorized disclosure, release, data breaches, and theft.

202.    These actions also constitute deceptive and unfair acts or practices because Defendant knew the facts about its inadequate data security and failure to comply with applicable state and federal laws and industry standards would be unknown to and not easily discoverable by Plaintiffs and the Illinois Subclass and defeat their reasonable expectations about the security of their PII.

203.    Moreover, Defendant represented that it would maintain the data it collected in a secure manner and endeavor to keep it safe from unauthorized access and exfiltration.

204.    Defendant intended that Plaintiffs and the Illinois Subclass rely on its deceptive and unfair acts and practices and the concealment and omission of material facts in connection with Defendant's offering of goods and services.

205.    Defendant's wrongful practices were and are injurious to the public because those practices were part of Defendant's generalized course of conduct that applied to the Illinois Subclass. Plaintiffs and the Illinois Subclass have been adversely affected by Defendant's conduct and the public was and is at risk as a result thereof.

206.    Defendant also violated 815 ILCS 505/2 by failing to immediately notify Plaintiff and the Illinois Subclass of the nature and extent of the Data Breach pursuant to the Illinois Personal Information Protection Act, 815 ILCS 530/1, *et seq*.

207.    As a result of Defendant's wrongful conduct, Plaintiffs and the Illinois Subclass were injured in that they never would have provided their PII to Defendant, or purchased Defendant's services, had they known or been told that Defendant failed to maintain sufficient security to keep their PII from being hacked and taken and misused by others.

208.    As a direct and proximate result of Defendant's violations of the CFA, Plaintiffs and the Illinois Subclass have suffered harm, including actual instances of identity theft; loss of time and money resolving fraudulent charges; loss of time and money obtaining protections against future identity theft; financial losses related to the payments or services made to Defendant that Plaintiffs and the Illinois Subclass would not have made had they known of Defendant's inadequate data security; lost control over the value of their PII; unreimbursed losses relating to fraudulent charges; harm resulting from damaged credit scores and information; and other harm resulting from the unauthorized use or threat of unauthorized use of stolen PII, entitling them to damages in an amount to be proven at trial.

209.     Pursuant to 815 Ill. Comp. Stat. § 505/10a(a), Plaintiffs and the Illinois Subclass seek actual and compensatory damages, injunctive relief, and court costs and attorneys' fees as a result of Defendant's violations of the CFA.

## COUNT V

**DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF**
**(On Behalf of Plaintiffs and the Class)**

210.     Plaintiffs re-allege and incorporate paragraphs 1-130 as if fully set forth herein.

211.     Plaintiffs bring this count on behalf of themselves and the Class.

212.     The Declaratory Judgment Act, 28 U.S.C. § 2201, *et. seq*., authorizes this Court to enter a judgment declaring the rights and legal relations of the parties and grant further necessary relief.  Furthermore, the Court has broad authority to restrain acts, such as here, that are tortious and violate the terms of the federal and state statutes described in this Complaint.

213.     Defendant owes duties of care to Plaintiffs and Class Members which require it to adequately secure their PII.

214.     Defendant still possesses Plaintiffs' and Class members' PII.

215.     Defendant did not specify in its Data Breach notification letters what steps they have taken to prevent a similar breach from occurring again.

216.     Plaintiffs and Class Members are at risk of harm due to the exposure of their PII and Defendant's failures to address the security failings that lead to such exposure.

217.     An actual controversy has arisen in the wake of the Data Breach regarding Defendant's present and prospective common law and other duties to reasonably safeguard Plaintiffs' and the Class Members' PII and whether Defendant is currently maintaining data security measures adequate to protect Plaintiffs and the Class from further data breaches that compromise their PII.

218.     Plaintiffs and the Class, therefore, seek a declaration that (1) each of Defendant's existing security measures do not comply with its obligations and duties of care to provide reasonable security procedures and practices appropriate to the nature of the information to protect consumers' PII, and (2) to comply with its duties of care, Defendant must implement and maintain reasonable security measures, including, but not limited to:

    a.   Engaging third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendant's systems on a periodic basis, and ordering Defendant to promptly correct any problems or issues detected by such third-party security auditors;

    b.   Engaging third-party security auditors and internal personnel to run automated security monitoring;

    c.   Auditing, testing, and training its security personnel regarding any new or modified procedures;

    d.   Segmenting user applications by, among other things, creating firewalls and access controls so that if one area is compromised, hackers cannot gain access to other portions of Defendant's systems;

    e.   Conducting regular database scanning and security checks;

    f.   Routinely and continually conducting internal training and education to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach;

    g.   Purchasing credit monitoring services for Plaintiffs and Class Members for their respective lifetimes; and

h.   Meaningfully educating Plaintiffs and Class Members about the threats they face as a result of the loss of their PII to third parties, as well as the steps they must take to protect themselves.

219.   The Court should issue corresponding prospective injunctive relief requiring Defendant to employ adequate security protocols consistent with the law and industry standards to protect Plaintiffs' and Class Members' PII.

220.   If an injunction is not issued, Plaintiffs and the Class will suffer irreparable injury, and lack an adequate legal remedy, in the event of another data breach of Defendant's systems or networks.  The risk of another breach is real, immediate, and substantial.

221.   The hardship to Plaintiffs and the Class if an injunction does not issue exceeds the hardship to Defendant if an injunction is issued.  If another data breach occurs, Plaintiffs and the Class will likely be subjected to fraud, identity theft, and other harms described herein.  But, the cost to Defendant of complying with an injunction by employing reasonable prospective data security measures is minimal given they have pre-existing legal obligations to employ these measures.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, on behalf of themselves and all Class Members, request judgment against Defendant and that the Court grant the following:

A.   An Order certifying the Class and the State Subclasses, as defined herein, and appointing Plaintiffs and their counsel to represent the Class and State Subclasses;

B.   Equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of Plaintiffs' and the Class Members' PII, and from refusing to issue prompt, complete, and accurate disclosures to Plaintiffs and the Class Members;

   C.     Injunctive relief requested by Plaintiffs, including but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiffs and Class Members, including but not limited to an order:

    i.   prohibiting Defendant from engaging in the wrongful and unlawful acts described herein;

   ii.   requiring Defendant to protect, including through encryption, all data collected through the course of its business in accordance with all applicable regulations, industry standards, and federal, state, or local laws;

  iii.   requiring Defendant to provide out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their PII for Plaintiffs' and Class Members' respective lifetimes;

  iv.   requiring Defendant to delete, destroy, and purge the PII of Plaintiffs and Class Members unless Defendant can provide to the Court reasonable justification for the retention and use of such information when weighed against the privacy interests of Plaintiffs and Class Members;

   v.   requiring Defendant to implement and maintain a comprehensive Information Security Program designed to protect the confidentiality and integrity of the PII of Plaintiffs and Class Members;

  vi.   prohibiting Defendant from maintaining Plaintiffs' and Class Members' personally identifying information on a cloud-based database;

 vii.   requiring Defendant to engage independent third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on

Defendant's systems on a periodic basis, and ordering Defendant to promptly correct any problems or issues detected by such third-party security auditors;

viii.  requiring Defendant to engage independent third-party security auditors and internal personnel to run automated security monitoring;

ix.  requiring Defendant to audit, test, and train its security personnel regarding any new or modified procedures;

x.  requiring Defendant to segment data by, among other things, creating firewalls and access controls so that if one area of Defendant's network is compromised, hackers cannot gain access to other areas of Defendant's systems;

xi.  requiring Defendant to conduct regular database scanning and securing checks;

xii.  requiring Defendant to establish an information security training program that includes at least annual information security training for all employees, with additional training to be provided as appropriate based upon the employees' respective responsibilities with handling personally identifying information, as well as protecting the personally identifying information of Plaintiffs and Class Members;

xiii.  requiring Defendant to routinely and continually conduct internal training and education, and on an annual basis to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach;

xiv.  requiring Defendant to implement a system of tests to assess its employees' knowledge of the education programs discussed in the preceding subparagraphs, as well as randomly and periodically testing employees' compliance with Defendant's policies, programs, and systems for protecting

personally identifying information;

xv.   requiring Defendant to implement, maintain, regularly review, and revise as necessary a threat management program designed to appropriately monitor Defendant's information networks for threats, both internal and external, and assess whether monitoring tools are appropriately configured, tested, and updated;

xvi.   requiring Defendant to adequately educate all Class Members about the threats that they face as a result of the loss of their confidential PII to third parties, as well as the steps affected individuals must take to protect themselves;

xvii.   requiring Defendant to implement logging and monitoring programs sufficient to track traffic to and from Defendant's servers; and, for a period of 10 years, appointing a qualified and independent third party assessor to conduct a SOC 2 Type 2 attestation on an annual basis to evaluate Defendant's compliance with the terms of the Court's final judgment, to provide such report to the Court and to Class Counsel, and to report any material deficiencies or noncompliance with the Court's final judgment;

D.   For an award of damages, including actual, statutory, consequential, and nominal damages, as allowed by law in an amount to be determined;

E.   For an award of reasonable attorneys' fees, costs, and litigation expenses, as allowed by law;

F.   For prejudgment interest on all amounts awarded; and

G.   Such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand that this matter be tried before a jury.


Date: November 16, 2022                        Respectfully submitted,


*/s/ Julie Braman Kane*
JULIE BRAMAN KANE
Florida Bar No. 980277
**COLSON HICKS EIDSON**
255 Alhambra Circle – Penthouse
Coral Gables, Florida 33134
Telephone: (305) 476-7400
Facsimile: (305) 476-7444
julie@colson.com

JOHN A. YANCHUNIS
RYAN D. MAXEY
**MORGAN & MORGAN**
**COMPLEX LITIGATION GROUP**
201 N. Franklin Street, 7th Floor
Tampa, Florida 33602
Telephone: (813) 223-5505
jyanchunis@ForThePeople.com
rmaxey@ForThePeople.com

M. ANDERSON BERRY*
GREGORY HAROUTUNIAN*
**CLAYEO C. ARNOLD,**
**A PROFESSIONAL LAW CORP.**
865 Howe Avenue
Sacramento, CA 95825
Telephone: (916) 777-7777
Facsimile: (916) 924-1829
aberry@justice4you.com
gharoutunian@justice4you.com

RACHELE R. BYRD*
**WOLF HALDENSTEIN ADLER**
**FREEMAN & HERZ LLP**
750 B Street, Suite 1820
San Diego, CA 92101
Telephone:  619/239-4599
Facsimile:  619/234-4599
byrd@whafh.com

ADAM E. POLK*
JORDAN ELIAS*
SIMON GRILLE*
KIMBERLY MACEY*
**GIRARD SHARP LLP**
601 California St, Ste 1400
San Francisco, CA  94108
Telephone: (415) 981-4800
apolk@girardsharp.com
jelias@girardsharp.com
sgrille@girardsharp.com
kmacey@girardsharp.com

TERRY R. COATES*
DYLAN J. GOULD*
**MARKOVITS, STOCK &
    DEMARCO, LLC**
119 E. Court Street, Suite 530
Cincinnati, OH 45202
Telephone: 513/651-3700
513/665-0219 (fax)
tcoates@msdlegal.com
dgould@msdlegal.com

*Pro hac vice* forthcoming

*Attorneys for Plaintiffs*